# GRAY *v.* MISSISSIPPI

No. 85–5454.   Argued November 12, 1986—Decided May 18, 1987

BLACKMUN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A, III–B–1, and IV, in which BRENNAN, MARSHALL, POWELL, and STEVENS, JJ., joined, and an opinion with respect to Part III–B–2, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in part and concurring in the judgment, *post*, 669. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE and O'CONNOR, JJ., joined, *post*, 672.

*Andru H. Volinsky* argued the cause and filed briefs for petitioner.

*Marvin L. White, Jr.*, Assistant Attorney General of Mississippi, argued the cause for respondent. With him on the brief were *Edwin Lloyd Pittman*, Attorney General, and *Amy D. Whitten*, Special Assistant Attorney General.*

JUSTICE BLACKMUN announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A, III–B–1, and IV, and an opinion with respect to Part III–B–2, in which JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join.

More than 10 years ago, in *Davis* v. *Georgia*, 429 U. S. 122 (1976) *(per curiam)*, this Court on certiorari summarily reversed a judgment of a state court and ruled that when a trial court misapplies *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), and excludes from a capital jury a prospective juror who in fact is qualified to serve, a death sentence imposed by

---

*A brief of *amici curiae* urging affirmance was filed for the State of North Carolina et al. by *Lacy H. Thornburg*, Attorney General, *Joan H. Byers*, Special Deputy Attorney General, *David Roy Blackwell*, Assistant Attorney General, *Charles A. Graddick*, Attorney General of Alabama, *John Van de Kamp*, Attorney General of California, *John I. Kelly*, Chief State's Attorney of Connecticut, *Charles M. Oberly III*, Attorney General of Delaware, *Jim Smith*, Attorney General of Florida, *Neil F. Hartigan*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *William J. Guste, Jr.*, Attorney General of Louisiana, *T. Travis Medlock*, Attorney General of South Carolina, *Mark V. Meierhenry*, Attorney General of South Dakota, *Mary Sue Terry*, Attorney General of Virginia, and *A. G. McClintock*, Attorney General of Wyoming.

the jury cannot stand.[1]   This case presents the question whether the Court now should abandon that ruling and, instead, subject an impermissible exclusion to harmless-error review.

## I

In June 1982, petitioner David Randolph Gray was indicted in Harrison County, Miss., on a capital charge for the stabbing death of Ronald Wojcik while engaged in the commission of the felony of kidnaping.[2]   The trial judge began the jury selection process by assembling the entire venire in the courtroom.   He then formed an initial panel for *voir dire* by calling 12 persons to the jury box.   Tr. 193–194.   After preliminary questioning by the court regarding prior knowledge of the case and of the parties involved, the prosecutor commenced his examination of the panel.   After a member was removed for cause or by the prosecutor's use of a peremptory challenge, another venire member was called to the box for questioning by the prosecutor.   When the prosecutor reached the point where he acknowledged that he would accept the full panel as it stood, the *voir dire* shifted to the defense and petitioner's attorney followed the same procedure. The questioning continued in this alternating fashion, with each side examining those venire members who had been called to the box since its last opportunity to inquire, until the final panel was selected.

The panel members were questioned individually for the most part, but this took place in the presence of the others

---

[1] Three Members of the Court dissented from the summary disposition of the *Davis* case.   They would have given it plenary consideration.   See 429 U. S., at 123.   The Court, of course, at times has said that summary action here does not have the same precedential effect as does a case decided upon full briefing and argument.   See, *e. g., Edelman* v. *Jordan,* 415 U. S. 651, 671 (1974).

[2] The circumstances of the repulsive crime are set forth in the opinion of the Supreme Court of Mississippi.   See 472 So. 2d 409, 412 (1985).   Because the legal issue presented for this Court's review concerns the procedures followed during jury selection, we confine our recitation of facts to those relevant to that process.

in the box as well as in the presence of all prospective jurors in the courtroom waiting to be called. As a result, venire members were able to learn the consequences of different responses. In particular, they learned what response would likely result in their being excluded from the jury. This knowledge caused difficulty during the prosecutor's questioning. He asked each panel member whether he or she had any conscientious scruples against capital punishment and whether he or she could vote to impose a death sentence. Whenever a prospective juror revealed any such scruples or expressed any degree of uncertainty in the ability to cast such a vote, the prosecutor moved to have the panel member excused for cause. In one instance the court granted that motion. *Id.*, at 368. In eight instances, however, the court denied the motion. The prosecutor then used peremptory challenges to remove those eight panel members. App. 3, 5, 6, 9, 12, 13, 15, 16.[3] After his denials of these for-cause motions, the judge observed that venire members perhaps were not being forthright in their responses to the prosecutor. He criticized them for expressing insincere hesitation about

---

[3] A motion to excuse a venire member for cause of course must be supported by specified causes or reasons that demonstrate that, as a matter of law, the venire member is not qualified to serve. J. Van Dyke, Jury Selection Procedures 139–140 (1977). There is no limitation on the number of venire members who may be challenged for cause. *Ibid.* In contrast, States traditionally have limited the number of peremptory challenges allotted to litigants because peremptory challenges ordinarily can be exercised without articulating reasons, *id.*, at 145–147, subject to constitutional limitations. See *Batson* v. *Kentucky*, 476 U. S. 79 (1986). A Mississippi statute provides: "In capital cases the defendant and the state shall each be allowed twelve peremptory challenges." Miss. Code Ann. § 99–17–3 (1972).

Although the prosecutor at Gray's trial did not refer expressly to this Court's decision in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), it is clear that he was attempting to convince the court that these eight prospective jurors' scruples about the death penalty were so strong that they would not merely heighten the jurors' sense of responsibility, but rather would prevent them from acting in accordance with their oaths, Tr. 408, and thus, under *Witherspoon*, render them excludable for cause.

the death penalty in order to be excluded from the jury. He admonished them: "Now I don't want nobody telling me that, just to get off the jury. Now, that's not being fair with me." *Id.*, at 16.[4]

By the time venire member Mrs. H. C. Bounds was called to the jury box, the prosecutor had exercised all 12 of the State's peremptory challenges, see Miss. Code Ann. § 99–17–3 (1972), 4 of which apparently were exercised for reasons unrelated to the panel members' responses to *Witherspoon* questions. See Tr. 301–302, 381, 390–391. Although the *voir dire* of member Bounds was somewhat confused, she ultimately stated that she could consider the death penalty in an appropriate case and the judge concluded that Bounds was capable of voting to impose it.[5] Evidently de-

---

[4] Our review of the transcript of the entire *voir dire* reveals that this problem had become apparent to the prosecutor before the judge uttered his admonition. During his earlier questioning of another venire member, who stated that he might have conscientious scruples against capital punishment, the prosecutor interrupted and said: "Let me tell you this, let me say this to you before you answer that. . . . I need to know whether you believe in that or whether you want to get off the Jury. You'd just rather not serve." App. 13. Another venire member's response to the prosecutor's *Witherspoon* question is equally telling: "I mean, the way the Jury is going now, what I'm saying is, I would, I would vote not guilty. . . . I would, you know, I would vote not guilty on the Death Penalty." *Id.*, at 7–8.

[5] The court questioned Bounds in an effort to clarify her position:

"BY THE COURT: In other words, you do not have any conscientious scruples against the imposition of the Death Penalty, if it's authorized by law. Is that right?

"BY MRS. BOUNDS: No.

"BY THE COURT: No. Okay." *Id.*, at 18.

After further questioning by the prosecutor in an attempt to demonstrate that Bounds was excludable for cause, the court *again acknowledged* Bounds' eligibility to serve:

"BY THE COURT: You could vote for the Death Penalty?

"BY MRS. BOUNDS: I think I could.

"BY THE COURT: All right. She says she can vote for the Death Penalty." *Id.*, at 22.

ciding that he did not want Bounds on the jury and realizing that he had no peremptory challenge left, the prosecutor asked the court to allow the State another such challenge.[6] App. 22. He argued that the court had erred in denying five or six of the State's for-cause challenges and thereby had compelled the State to use its peremptory challenges against those venire members. The prosecutor asserted that, if he had another challenge, he would use it to remove Bounds. *Ibid.*

The judge initially observed, "Well, I think that's right, I made you use about five of them that didn't equivocate. Uh, I never had no idea that we'd run into this many." *Id.*, at 23. After defense counsel objected to granting the State a 13th peremptory challenge, *ibid.*, the prosecutor urged the court to reverse one of its earlier denials of his for-cause motions, which would restore a peremptory challenge to the State. The trial court responded:

"Well, I didn't examine them myself. Of course, I admit that they were unequivocal, about five of them, that answered you that way.

"Go ask her [Bounds] if she'd vote guilty or not guilty, . . . and let's see what she says to that.

"If she says, if she gets to equivocating on that, I'm going to let her off as a person who can't make up her mind." *Ibid.*

In response to the prosecutor's questioning, Bounds stated that she could reach either a guilty or not guilty verdict and that she could vote to impose the death penalty if the verdict were guilty. *Id.*, at 24. Despite these answers, the pros-

---

[6] In response to questioning from this Court during oral argument here, counsel for the State said that in some Mississippi cases, the trial judge has allowed additional peremptory challenges. He went on to say, however, that he was unaware of any state-court decision on the issue. Tr. of Oral Arg. 35–37. He noted that, on the occasions of which he was aware, when additional peremptory challenges were granted, the opposing side also received an equal number. *Id.*, at 36.

ecutor renewed his motion that she be removed for cause. Defense counsel pointed out that Bounds' answers to the questions did not render her excludable. He further contended that the prosecutor had not properly questioned the earlier jurors, who had not been excused for cause, to determine whether they were excludable under *Witherspoon.* The judge agreed that the prosecutor had not used the appropriate language and noted, "I should have questioned them on this, I guess. . . ." *Id.,* at 25.

After still further discussion, the judge excused Bounds for cause, but expressly declined to reconsider his earlier refusals to strike venire members for cause.[7] The *voir dire* continued until both sides accepted 12 venire members in the box

---

[7] The court prefaced its conclusion with the following explanation:

"I'd hate to get a conviction and get it reversed because of this one woman. She can't make up her mind.

"Well, let the record show that the Court is of the firm opinion that there was at least five, even though I think there's around nine challenges been used by the District Attorney for cause, either eight or nine, all right, there was eight of them that had said that they were against Capital Punishment.

"And I think there was, uh, five of those that were unequivocally opposed to it and answered, in substance, if not even stronger language than the question set forth in the Witherspoon case, uh, from the United States Supreme Court, uh, that I should, at this point, allow him to challenge this lady for cause. She is totally indecisive. I think she is totally indecisive. She says one thing one time and one thing another.

"The Court is of the opinion that it cheated the State . . . by making the District Attorney use his peremptory challenges in at least five instances. And I'm going to allow it in this particular case."

"BY MR. STEGALL [defense counsel]: Excuse her for cause?

"BY THE COURT: I'm going to excuse her.

"BY MR. STEGALL: Let me ask the Court this, is the Court of the opinion that, uh, that there has been a sufficient record. . . .

"BY THE COURT: (Interposing) I'm not going to add any to his challenges.

"BY MR. STEGALL: Okay. All right.

"BY THE COURT: I'm not going to go back and give him five more. *I'm going to excuse her for cause.*" App. 26 (emphasis added).

and two alternates. The trial began that afternoon and concluded three days later when the jury convicted petitioner of capital murder and sentenced him to death.

In an otherwise unanimous opinion, the Supreme Court of Mississippi divided on petitioner's claim that his death sentence was invalid because the exclusion of Bounds violated his right to a fair and impartial jury and was inconsistent with *Witherspoon*'s dictates. 472 So. 2d 409 (1985). The majority stated at the outset that the jury selection problem in the case was created in part by the trial court's failure to follow the *voir dire* guidelines for capital cases set forth in *Armstrong* v. *State*, 214 So. 2d 589, 593 (Miss. 1968), cert. denied, 395 U. S. 965 (1969), which were aimed at ensuring compliance with *Witherspoon*. 472 So. 2d, at 421. Despite this violation of state procedure, the court affirmed petitioner's sentence as well as the judgment of conviction.

The majority explained that reluctance on the part of some venire members to serve complicated the jury selection. *Ibid.* The majority did not discuss in any detail the *voir dire* of the venire members whom the State removed by peremptory challenges. It noted, however, that the trial court had refused to excuse several jurors who had expressed conscientious scruples against the death penalty and who had stated they could not vote to inflict it. The majority offered the following explanation for the trial judge's action:

> "It is abundantly clear from the record that his reason for doing so was because he believed that the jurors were simply claiming to have conscientious scruples against the death penalty so that they could be released from jury service. Confronted by what he believed to be insincere attestations of personal moral convictions, the trial court was unwilling to dismiss those jurors for cause even though their responses clearly indicated that they could properly be so dismissed both under *Witherspoon* and *Adams* [v. *Texas*, 448 U. S. 38 (1980)]." *Id.*, at 421–422 (footnote omitted).

After reviewing Bounds' *voir dire,* the majority agreed with petitioner that Bounds "was clearly qualified to be seated as a juror under the *Adams* and [*Wainwright* v.] *Witt,* [469 U. S. 412 (1985)] criteria." *Id.,* at 422. It concluded, however, that petitioner was not prejudiced by the trial court's erroneous exclusion of this juror:

> "The force and effect of the trial court's ruling was to correct an error he had committed in refusing to dismiss other jurors for cause after they had unequivocally stated that they could not vote to impose the death penalty in any circumstance. . . . That being the case the trial court was correct when it recognized the error in its prior rulings and took affirmative action to correct that error." *Id.,* at 422–423.

Writing in dissent and joined by two other members of the court, Justice Sullivan emphasized that, according to the record, the trial judge excused Bounds for cause ("the majority . . . contradicts the trial judge's very words"), not on the basis of a peremptory challenge. *Id.,* at 424. In the dissent's view, the majority's reasoning was invalid because, under *Davis* v. *Georgia,* courts could not treat erroneous *Witherspoon* dismissals as harmless error. 472 So. 2d, at 425.

We granted certiorari, 475 U. S. 1010 (1986), to consider whether to abandon the *Davis* ruling and whether the improper excusal of a juror for cause can be harmless.

## II

In *Witherspoon,* this Court held that a capital defendant's right, under the Sixth and Fourteenth Amendments, to an impartial jury prohibited the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U. S., at 522. It reasoned that the exclusion of venire members must be limited to those who were "irrevocably committed . . . to vote against the penalty

of death regardless of the facts and circumstances that might emerge in the course of the proceedings," and to those whose views would prevent them from making an impartial decision on the question of guilt. *Id.*, at 522, n. 21. We have reexamined the *Witherspoon* rule on several occasions, one of them being *Wainwright* v. *Witt*, 469 U. S. 412 (1985), where we clarified the standard for determining whether prospective jurors may be excluded for cause based on their views on capital punishment. We there held that the relevant inquiry is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.*, at 424, quoting *Adams* v. *Texas*, 448 U. S. 38, 45 (1980).

There is no need to delve again into the intricacies of that standard. It is necessary, however, to keep in mind the significance of a capital defendant's right to a fair and impartial jury under the Sixth and Fourteenth Amendments.

JUSTICE REHNQUIST, in writing for the Court, recently explained:

> "It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart* v. *McCree*, 476 U. S. 162, 176 (1986).

The State's power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would "frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths." *Wainwright* v. *Witt*, 469 U. S., at 423. To permit the exclusion for cause of other prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members. It "stack[s] the deck against the petitioner. To execute

[such a] death sentence would deprive him of his life without due process of law." *Witherspoon* v. *Illinois*, 391 U. S., at 523.

Every Justice of the Mississippi Supreme Court expressly stated that panel member Bounds "was clearly qualified to be seated as a juror under the *Adams* and *Witt* criteria." 472 So. 2d, at 422 and 424. We agree. Gray's death sentence therefore cannot stand unless this Court chooses to abandon *Davis*.

### III

Although *Davis* was not cited in the Mississippi Supreme Court's majority opinion in the present case, this Court in *Davis* surely established a *per se* rule requiring the vacation of a death sentence imposed by a jury from which a potential juror, who has conscientious scruples against the death penalty but who nevertheless under *Witherspoon* is eligible to serve, has been erroneously excluded for cause. See *Davis*, 429 U. S., at 123–124 (dissenting opinion). The *Davis per curiam* opinion served to identify the Court's course after *Witherspoon*.[8] Soon after *Witherspoon* was decided, the Court was presented with several situations in which state courts had exhibited their confusion as to how to apply the standard enunciated in that case.[9] In 1971, it had sum-

---

[8] During the two years following *Witherspoon*, the Court twice reaffirmed its holding in brief opinions demonstrating its correct application. See *Boulden* v. *Holman*, 394 U. S. 478, 481–484 (1969), and *Maxwell* v. *Bishop*, 398 U. S. 262, 264–266 (1970) *(per curiam)*.

[9] Some courts already had recognized, however, the full import of the constitutional mandate expressed in *Witherspoon*. In *Marion* v. *Beto*, 434 F. 2d 29 (1970), cert. denied, 402 U. S. 906 (1971), the Court of Appeals for the Fifth Circuit described the split among state and lower federal courts on the effect of *Witherspoon* violations. 434 F. 2d, at 31–32. It concluded that the improper exclusion of even a single prospective juror from a capital jury required reversal of a death sentence for the reason that it prejudiced a defendant's right to an impartial jury, a right of particular significance in capital cases because of the magnitude of the decision and because jury unanimity was required. *Id.*, at 32. The Supreme Court of California refused to find an erroneous exclusion harmless even though it was suggested that the prosecutor would have used his peremptory challenges to

marily reversed the judgments in 23 cases imposing death sentences and had remanded the cases for further proceedings in light of *Witherspoon* and its progeny. See 403 U. S. 946–948. Several of the state courts in those cases had relied on harmless-error analyses similar to those Mississippi seeks to resurrect here. See nn. 14 and 16, *infra*.

We did not have occasion to revisit the *Witherspoon* issue during the period between the decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972), and *Branch* v. *Texas*, decided with *Furman*, where Georgia and Texas death sentences were invalidated, and the decisions in *Gregg* v. *Georgia*, 428 U. S. 153 (1976), and its companion cases, where we upheld post-*Furman* death penalty statutes against constitutional challenge. But after *Gregg*, the *Witherspoon* issue again appeared. In fact, our first post-*Gregg* opinion in a capital case was *Davis*, which served to inform lower courts that we would continue to treat *Witherspoon* violations as reversible constitutional error in the post-*Gregg* era. 429 U. S., at 123. The instant case presents yet another opportunity for this Court to adopt a harmless-error analysis and once again we decline to do so.

The efforts to apply a harmless-error determination to *Witherspoon* violations have suggested two analyses. See Krauss, The *Witherspoon* Doctrine at *Witt*'s End: Death-Qualification Reexamined, 24 Am. Crim. L. Rev. 1, 32, n. 111 (1987). The first is to consider the state's retention of unexercised peremptory challenges at the end of jury selection as an indication that the erroneous for-cause exclusion was harmless. This approach relies on a representation by the state that it would have removed the venire member by peremptory challenge if the court had denied its for-cause

exclude all prospective jurors opposed to the death penalty. *In re Anderson*, 69 Cal. 2d 613, 618–620, 447 P. 2d 117, 121–122 (1968), cert. denied *sub nom. Anderson* v. *California*, 406 U. S. 971 (1972). It noted that *Witherspoon* held that exclusion of all such prospective jurors did not yield an impartial jury. 69 Cal. 2d, at 620, 447 P. 2d, at 122.

motion. The second is to treat the erroneous exclusion as an isolated incident without prejudicial effect if it cannot be said that the ultimate panel did not fairly represent the community anyway. The Mississippi Supreme Court appears to have relied on a variation of the first analysis; respondent urges the Court to adopt the second.[10] We find each unpersuasive.

## A

The seeming ambiguity of the Mississippi Supreme Court's opinion complicates somewhat our examination of its harmless-error analysis. The opinion is susceptible to three possible interpretations. The first is that, in the court's view, the trial judge recognized that he had erred earlier in failing to dismiss one of the jurors for cause and therefore restored to the State a peremptory challenge that the prosecutor then exercised to remove Bounds. The second is that the court could be seen as concluding that the trial court itself offset its earlier error in denying a valid for-cause *Witherspoon* motion by granting an invalid for-cause *Witherspoon* motion as to Bounds. The third is that the court could be seen to have decided that the trial judge restored a peremptory challenge to the State, by determining that he had erred previously in denying one of the prosecutor's *Witherspoon* motions, but still removed Bounds for cause. Under this interpretation, the court would have reasoned that, although the trial judge erred in removing Bounds for cause, the error was harmless because the State had an unexercised peremptory challenge

---

[10] The State has devoted a significant portion of its brief to an argument based on the deference this Court owes to findings of fact made by a trial court. Such deference is inappropriate where, as here, the trial court's findings are dependent on an apparent misapplication of federal law, *Rogers* v. *Richmond*, 365 U. S. 534, 547 (1961), and are internally inconsistent. We rest our reasoning on the one unambiguous finding made by the trial court and affirmed on appeal—that the court was not authorized under the *Witherspoon-Witt* standard to exclude venire member Bounds for cause. See n. 5, *supra*.

that the prosecutor would have used to remove Bounds if the trial judge had refused to remove her for cause.

We disagree with the judgment if and to the extent it rests on the first interpretation because that reasoning is wholly unsupported by the record. The trial judge was explicit in his explanation that Bounds was removed for cause. See n. 7, *supra.* It is by no means clear that, in his view, he erred in denying the prosecutor's *Witherspoon* motions. Whether he actually erred in his earlier denials simply cannot be discerned from the record. Although the trial judge acknowledged that some of the venire members had responded to the prosecutor's questioning in language at least suggesting that they would be excludable under *Witherspoon*, the judge agreed with defense counsel that the prosecutor had not properly questioned the earlier venire members. App. 25. In order to avoid errors based on this type of failure to establish an adequate foundation for juror exclusion, Mississippi law, contrary to the implications in the dissent, requires the trial judge himself to question the venire members.[11] The trial judge in this case, however, did not comply with the Mississippi procedure. Had he done so, despite their initial

---

[11] The Mississippi Supreme Court, in the present case, explained that, under state law in a capital case, the trial judge should ask the venire members

"'if any member of the panel has any conscientious scruples against the infliction of the death penalty, when the law authorizes it, in proper cases, and where the testimony warrants it. If there are those who say that they are opposed to the death penalty, the trial judge should then go further and ask those veniremen, who have answered in the affirmative, whether or not they could, nevertheless, follow the testimony and the instructions of the court and return a verdict of guilty although that verdict could result in the death penalty, if they, being the judges of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict. Those who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released.'" 472 So. 2d, at 421, quoting *Armstrong* v. *State*, 214 So. 2d 589, 593 (Miss. 1968).

responses, the venire members might have clarified their positions upon further questioning and revealed that their concerns about the death penalty were weaker than they originally stated. It might have become clear that they could set aside their scruples and serve as jurors. The inadequate questioning regarding the venire members' views in effect precludes an appellate court from determining whether the trial judge erred in refusing to remove them for cause.[12]

We also disagree with the judgment of the Mississippi Supreme Court if and to the extent that it might be seen to approve a trial court's remedying an erroneous denial of a *Witherspoon* motion by granting an invalid *Witherspoon* motion. Our reasons are embraced by that well-worn adage that "two wrongs do not make a right." Although we prefer that a trial court remedy its own mistakes if possible, we cannot condone the "correction" of one error by the commitment of another.

Moreover, the fact that the State may have been deprived improperly of peremptory challenges does not render the *Witherspoon* error any less a violation of petitioner's constitutional rights guaranteed by the Sixth and Fourteenth Amendments. Peremptory challenges are not of constitutional origin. See *Batson* v. *Kentucky*, 476 U. S. 79, 91 (1986); *Swain* v. *Alabama*, 380 U. S. 202, 219 (1965); *Stilson* v. *United States*, 250 U. S. 583, 586 (1919). In a situation such as this where a constitutional right comes into conflict with a statutory right, the former prevails.[13]

---

[12] The trial judge himself belatedly realized that he should have questioned the jurors more extensively, pursuant to state law, about their views on the death penalty. App. 23, 25. Furthermore, if he had intended to correct earlier errors, one would expect that he would have identified specifically the earlier rulings he considered erroneous and restored to the prosecutor enough peremptory challenges to compensate for the errors.

[13] We do not suggest that, if the trial judge believed that he had applied an erroneous standard during *voir dire*, there was no way to correct the error. The Mississippi Supreme Court said that a trial court "should be

Finally, we disagree with the Mississippi Supreme Court's judgment if and to the extent it holds that a *Witherspoon* violation constitutes harmless error when the prosecutor has an unexercised peremptory challenge that he states he would have used to excuse the juror. At least two of this Court's 1971 summary reversals stand as prior rejections of this "unexercised peremptories" argument.[14]

A fresh examination of this argument also leads us to conclude that it must be rejected.[15] The unexercised pe-

---

afforded the opportunity to correct any errors at trial by way of a motion for a new trial." 472 So. 2d, at 423. In the situation presented by this case, the equivalent action would have been to dismiss the venire *sua sponte* and start afresh. The parties agreed that a new special capital venire could have been compiled in less than a month. Tr. of Oral Arg. 34–35, 46. The time period might have been even shorter in this case because the parties waived any right to have a special venire called. Tr. 52.

[14] In *People* v. *Bernette*, 45 Ill. 2d 227, 258 N. E. 2d 793 (1970), for example, the Supreme Court of Illinois had considered any *Witherspoon* violation to be harmless error because the State had 33 of its 40 peremptory challenges remaining that it otherwise might have used against the improperly excluded jurors. *Id.*, at 232, 258 N. E. 2d, at 796. This Court summarily reversed the Illinois Supreme Court's judgment. 403 U. S. 947 (1971). See also *Wigglesworth* v. *Ohio*, 403 U. S. 947 (1971), rev'g 18 Ohio St. 2d 171, 181, 248 N. E. 2d 607, 614 (1969).

[15] Other opinions expressly rejecting the unexercised peremptory argument are numerous. In *Moore* v. *Estelle*, 670 F. 2d 56, 57 (CA5), cert. denied, 458 U. S. 1111 (1982), the court rejected the argument because it refused to "countenance what amounts to an attempt to exercise—retroactively and by affidavit in defense of a collateral attack—peremptory challenges reserved at the time." See also *Hance* v. *Zant*, 696 F. 2d 940, 956 (CA11), cert. denied, 463 U. S. 1210 (1983) (existence of unexercised peremptory challenges does not render harmless exclusion of prospective alternate juror in violation of *Witherspoon*); *Blankenship* v. *State*, 247 Ga. 590, 277 S. E. 2d 505, 280 S. E. 2d 623 (1981) (see also specially concurring opinion on motion for reconsideration, *id.*, at 597, 280 S. E. 2d, at 624, demonstrating that unexercised peremptory harmless-error approach is inappropriate because in the jury selection process "there are too many variables which may give rise to the non-use of a peremptory challenge"); *Grijalva* v. *State*, 614 S. W. 2d 420, 424–425 (Tex. Crim. App. 1981) (re-

remptory argument assumes that the crucial question in the harmless-error analysis is whether a particular prospective juror is excluded from the jury due to the trial court's erroneous ruling. Rather, the relevant inquiry is "whether the composition of the *jury panel as a whole* could possibly have been affected by the trial court's error" (emphasis in original). *Moore* v. *Estelle*, 670 F. 2d 56, 58 (CA5) (specially concurring opinion), cert. denied, 458 U. S. 1111 (1982). Due to the nature of trial counsel's on-the-spot decisionmaking during jury selection, the number of peremptory challenges remaining for counsel's use clearly affects his exercise of those challenges. A prosecutor with fewer peremptory challenges in hand may be willing to accept certain jurors whom he would not accept given a larger reserve of peremptories. Even if one is to believe the prosecutor's statement that if his motion to remove Bounds for cause had been denied and he had had a peremptory remaining, he would have used it to remove her, we cannot know whether in fact he would have had this peremptory challenge left to use. That is, if the court had granted one or more of his earlier motions to remove for cause, the prosecutor may have used his peremptory challenges on other jurors whom he did not strike when he had fewer peremptory challenges to exercise. The nature of the jury selection process defies any attempt to establish that an erroneous *Witherspoon-Witt* exclusion of a juror is harmless.

The practical result of adoption of this unexercised peremptory argument would be to insulate jury selection error from meaningful appellate review. By simply stating during *voir dire* that the State is prepared to exercise a peremptory challenge if the court denies its motion for cause, a prosecutor could ensure that a reviewing court would consider any

jecting argument as matter of state law because allowing retrospective exercise of peremptory challenges on appeal transforms "a peremptory strike against a prospective juror" into "a peremptory strike against a ground of error").

erroneous exclusion harmless. A prosecutor, as a routine matter, would likely append a statement to this effect to his motion for cause.

## B

## 1

The State's argument that the erroneous exclusion of Bounds was a single technical error that should be considered harmless because it did not have any prejudicial effect is equally unavailing. The judgment of the Supreme Court of Georgia that was reversed in *Davis* rested on a similar analysis. See *Davis* v. *State*, 236 Ga. 804, 225 S. E. 2d 241 (1976). In this Court's *Davis* opinion, it cited three of its 1971 summary reversals which can be read as having rejected this argument.[16] 429 U. S., at 123. The State nevertheless urges us to apply the constitutional harmless-error analysis formulated in *Chapman* v. *California*, 386 U. S. 18 (1967), and affirm petitioner's death sentence.

In *Davis* v. *State*, the Georgia Supreme Court concluded that, despite the erroneous exclusion of a venire member whose scruples about the death penalty did not justify *Witherspoon* exclusion, Davis' death sentence could stand. The Georgia court correctly read *Witherspoon* to prohibit the State from "'entrust[ing] the determination of whether a man should live or die to a tribunal organized to return a verdict of death,'" and from "'stack[ing] the deck against the petitioner.'" 236 Ga., at 809, 225 S. E. 2d, at 244, quoting *Witherspoon* v. *Illinois*, 391 U. S., at 521, 523. It focused on *Witherspoon*'s statement that "'the decision whether a man deserves to live or die must be made on scales that are

---

[16] In *State* v. *Adams*, 76 Wash. 2d 650, 458 P. 2d 558 (1969), the Supreme Court of Washington reasoned that the incorrect exclusion of one potential juror did not require reversal of the death sentence because there was not an improper systematic exclusion of venire members. *Id.*, at 680–681, 458 P. 2d, at 576. This Court summarily reversed. 403 U. S. 947 (1971). See also *Wigglesworth* v. *Ohio*, 403 U. S. 947 (1971), rev'g 18 Ohio St. 2d 171, 248 N. E. 2d 607 (1969), and *Harris* v. *Texas*, 403 U. S. 947 (1971), rev'g 457 S. W. 2d 903 (Tex. Crim. App. 1970).

not deliberately tipped toward death.'" 236 Ga., at 809, 225
S. E. 2d, at 244, further quoting *Witherspoon*, 391 U. S., at
521–522, n. 20. The Georgia court, however, then con-
cluded: "The rationale of *Witherspoon* and its progeny is not
violated where merely *one* of a qualified class or group is ex-
cluded where it is shown, as here, that others of such group
were qualified to serve." 236 Ga., at 809, 225 S. E. 2d, at
244–245. The court observed that "other veniremen who ini-
tially expressed opposition to capital punishment . . . were
not excused when upon further examination it was deter-
mined they were not unalterably opposed to the death pen-
alty under all circumstances." *Id.*, at 810, 225 S. E. 2d, at
245. Nevertheless, this Court reversed the judgment and
held that the subsequently imposed death sentence could not
stand.

2

We reaffirm that ruling today in a case that brings into
focus one of the real-world factors that render inappropriate
the application of the harmless-error analysis to such errone-
ous exclusions for cause. Unlike *Davis* in which the state
court found that the erroneous exclusion of the scrupled, yet
eligible, venire member was an isolated incident because the
record revealed that similar jurors were not excused, the
record in the instant case does not support such a finding.
In fact, it suggests the opposite—that the State exercised its
peremptory challenges to remove all venire members who ex-
pressed any degree of hesitation against the death penalty.[17]
Because courts do not generally review the prosecution's rea-
sons for exercising peremptory challenges,[18] and because it

---

[17] The prosecutor made his goal very clear at one point:
"[W]hat I am trying to do is to find twelve people who tells (sic) me that
they have no conscientious scruples against Capital Punishment when im-
posed by the law." App. 16.

[18] Under our recent decision in *Batson* v. *Kentucky*, 476 U. S. 79 (1986),
however, a prosecutor's use of peremptory challenges is subject to judicial
review when a defendant establishes a prima facie case of purposeful dis-

appears that prosecutors often use peremptory challenges in this manner,[19] a court cannot say with confidence that an erroneous exclusion for cause of a scrupled, yet eligible, venire member is an isolated incident in that particular case. Therefore, we cannot say that courts may treat such an error as an isolated incident having no prejudicial effect.

Because the *Witherspoon-Witt* standard is rooted in the constitutional right to an impartial jury, *Wainwright* v. *Witt*, 469 U. S., at 416, and because the impartiality of the adjudicator goes to the very integrity of the legal system, the *Chapman* harmless-error analysis cannot apply. We have recognized that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman* v. *California*, 386 U. S., at 23. The right to an impartial adjudicator, be it judge or jury, is such a right. *Id.*, at 23, n. 8, citing, among other cases, *Tumey* v. *Ohio*, 273 U. S. 510 (1927) (impartial judge). As was stated in *Witherspoon*, a capital defendant's constitutional right not to be sentenced by a "tribunal organized to return a verdict of death" surely equates with a criminal defendant's right not to have his culpability determined by a "tribunal 'organized to convict.'" 391 U. S., at 521, quoting *Fay* v. *New York*, 332 U. S. 261, 294 (1947).

## IV

The judgment of the Supreme Court of Mississippi, insofar as it imposes the death sentence, is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

crimination based on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.

[19] See Winick, Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis, 81 Mich. L. Rev. 1 (1982); Lindsay, Prosecutorial Abuse of Peremptory Challenges in Death Penalty Litigation: Some Constitutional and Ethical Considerations, 8 Campbell L. Rev. 71 (1985).

JUSTICE POWELL, concurring in part and concurring in the judgment.

In *Davis* v. *Georgia*, 429 U. S. 122 (1976) *(per curiam)*, we held that if a single venire member is erroneously excluded for cause because of his views on the death penalty, a subsequently imposed capital sentence is invalid. The facts of this case show that Mrs. Bounds, although at times confused by the inartful *voir dire* questioning, finally stated explicitly that she would carry out her duty as a juror. Cf. *Wainwright* v. *Witt*, 469 U. S. 412, 424 (1985) (juror not excludable for cause unless his views would "'prevent or substantially impair the performance of his duties as a juror'" (quoting *Adams* v. *Texas*, 448 U. S. 38, 45 (1980))). Given Mrs. Bounds' willingness to impose a capital sentence in an appropriate case, I agree that the trial court erred in removing her for cause. We therefore are presented with the precise issue addressed in *Davis*.

I joined the *per curiam* opinion in *Davis*, and continue to believe that an improper exclusion of a juror in a capital case on these grounds should not be subject to a harmless-error analysis. The facts before us illustrate why a harmless-error analysis is inappropriate. JUSTICE SCALIA's dissent concludes that the exclusion of Mrs. Bounds had no effect on the composition of the jury because the prosecutor should have been allowed to exclude her peremptorily. The dissent points out that the prosecutor was required to exhaust his peremptory challenges because the trial judge erroneously refused to exclude other jurors for cause, despite their unequivocal opposition to the death penalty. *Post*, at 673. I agree that a number of these earlier jurors should have been excused.[1] Nevertheless, I cannot assume that the prosecu-

---

[1] As the dissent states, several of the potential jurors who were challenged unsuccessfully for cause explicitly stated that they would not impose the death sentence in any circumstance. See, *e. g.*, App. 3 (juror Ruiz would not impose the death sentence in "[a]ny type case"); *id.*, at 6 (juror Coker "would never vote for [capital punishment] in any case").

tor would have excluded Mrs. Bounds "but for" these mistakes. As the Court notes, it is difficult on appeal to reconstruct the prosecutor's *voir dire* strategy, and to predict who would have been excluded had the facts been different. If the prosecutor had not been compelled to use his challenges on other jurors, he certainly *may* have excluded Bounds. It also is possible, however, that the prosecutor would have saved his challenges on the chance that a more objectionable juror would come along, or perhaps he would have excluded an earlier juror on other grounds. Given our requirement of enhanced reliability in capital cases, I would hesitate to conclude that the composition of the venire "definitely" would have been the same, based solely on speculation as to how the prosecutor might have acted.[2] I therefore join in the judgment, and generally in the opinion except for Part III–B–2.

---

[2] JUSTICE SCALIA's dissent takes a somewhat different approach in arguing that the error in this case was harmless. He asserts that the above analysis misses the point, because it improperly focuses on the trial judge's failure to excuse the earlier jurors for cause, rather than on the judge's failure to revise these earlier rulings and permit the prosecutor to exercise another peremptory challenge. *Post*, at 678–679, n. 4. I agree with the dissent about which of the trial judge's rulings caused the harm; I simply disagree as to what inferences properly may be drawn in light of the error. There is no dispute that the ruling that prejudiced petitioner was the improper removal of Mrs. Bounds. Thus the only question is whether there is a reasonable doubt that the composition of the venire would have been different as a result. The dissent is convinced that the panel would not have changed, because if the judge had not excused Bounds for cause, he nevertheless would have reversed his earlier rulings and "returned" at least one of the State's peremptory challenges. I do not think the record supports such an inference. The trial judge was aware that he may have erred in not excusing the earlier panel members for cause, and was asked specifically to change some of these decisions. Although this procedure apparently is permitted under state law, and although the judge was plainly aware that the excusal of Bounds created a disputed question under the *Witherspoon* line of cases, the judge refused to change his rulings. See App. 26. I therefore am unpersuaded that but for the *Witherspoon* error, the prosecutor both could and would have removed Mrs. Bounds from the panel.

I disagree with the plurality to the extent that its decision rests on "real-world factors" such as the prosecutor's use of peremptory challenges. The plurality notes that *Davis* involved the exclusion of a single qualified venire member. *Ante*, at 667. The state court in *Davis* found no error because the exclusion was an isolated incident, a conclusion that this Court expressly rejected. See 429 U. S., at 123. In my view, our decision in *Davis* is sufficient to resolve the case, given that we cannot know what effect the excluded juror would have had on the panel as a whole. For unexplained reasons, however, the plurality seeks to distinguish *Davis* by pointing out that here the State "exercised its peremptory challenges to remove all venire members who expressed any degree of hesitation against the death penalty." *Ante*, at 667 (footnote omitted). I do not see the relevance of this observation. The plurality surely is not suggesting that this case would have come out differently if the prosecutor had *not* removed other jurors because of their attitude about capital punishment. Such a conclusion would restrict *Davis* rather than reaffirm it. Presumably, then, the plurality simply is expressing disapproval of the prosecutor's exclusion of jurors who could not be removed for cause.

There can be no dispute that a prosecutor has the right, indeed the duty, to use all legal and ethical means to obtain a conviction, including the right to remove peremptorily jurors whom he believes may not be willing to impose lawful punishment. Of course, defense counsel has the same right and duty to remove jurors he believes may be prosecution oriented. This Court's precedents do not suggest that the *Witherspoon* line of cases restricts the traditional rights of prosecutors and defense counsel to exercise their peremptory

It is irrelevant, of course, that the trial judge had the *authority* to remove Bounds for permissible reasons. In order for the error to be harmless, it must be shown that on the facts of this case, she definitely *would* have been removed, and thus that the venire would have been the same in the absence of the erroneous excusal for cause.

challenges in this manner. I therefore cannot agree that the prejudice created by Mrs. Bounds' removal was exacerbated by the proper exclusion of other jurors who may have shared her views.

The plurality acknowledges that judges normally may not inquire into the prosecutor's use of these challenges. *Ante*, at 667, n. 18. This Court has recognized one exception to that rule, when the defendant has established a prima facie case of racial bias in the selection of a particular venire. See *Batson* v. *Kentucky*, 476 U. S. 79 (1986). Our decision in *Batson*, however, was justified by the compelling need to remove all vestiges of invidious racial discrimination in the selection of jurors, a concern that obviously is not implicated on these facts. Nothing in *Batson* suggests that courts may examine the prosecutor's motives whenever he has excluded peremptorily those whom the court may not remove for cause. See *Brown* v. *North Carolina*, 479 U. S. 940 (1986) (O'CONNOR, J., concurring in denial of certiorari). Because the improper exclusion of even a single juror is sufficient to require resentencing in a capital case,[3] and because the prosecutor is free to exclude panel members who express doubt as to whether they could vote to impose capital punishment, I would attach no significance to the peremptory exclusion of the other jurors.

I join in the Court's judgment and in the opinion except for Part III–B–2.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

The Court holds that petitioner's sentence must be vacated because Mrs. Bounds was improperly excluded for cause from the sentencing jury. I dissent because it is clear that she should in any event have been excluded on other

---

[3] The decision today has no bearing on the validity of petitioner's conviction, only on the sentence. See *Witherspoon* v. *Illinois*, 391 U. S. 521, 523, n. 21 (1968).

grounds. The trial judge's error, if any, consisted of no more than giving the wrong reason for lawful action—which could not conceivably have affected the fairness of the sentence.

Before Mrs. Bounds' *voir dire*, the State moved to exclude nine potential jurors for cause. The trial judge granted only one of those motions, and the State excluded the other eight potential jurors by peremptory challenge. Five of those eight had unambiguously stated that they would never vote to impose the death penalty. See Record 368–369 (Mr. Ruiz), 381–383 (Mrs. Coker), 392–393 (Mrs. Bush), 394–395 and 398–399 (Mrs. Price), 401–403 (Mrs. Walker). These statements undoubtedly rendered them excludable for cause. See, *e. g.*, *Adams* v. *Texas*, 448 U. S. 38, 45 (1980) (a potential juror may be excluded for cause if his views about capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath"). See also *Darden* v. *Wainwright*, 477 U. S. 168, 175 (1986); *Wainwright* v. *Witt*, 469 U. S. 412, 420 (1985). Cf. *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968). The trial judge eventually realized that he had erred. See Record 554 ("[I] cheated the State by making . . . the District Attorney use his peremptory challenges in at least five instances"); *ibid.* (five potential jurors "were unequivocally opposed to [capital punishment] and answered, in substance, if not even stronger language than the question set forth in *[Witherspoon]*"); *id.*, at 548 ("Of course, I admit that they were unequivocal, about five of them . . .").[1] The

---

[1] Despite these statements, the Court asserts that it is not clear that the trial judge believed himself to have erred. *Ante*, at 655, 662–663, and n. 12. It rests that assertion solely on the trial judge's expressions of regret that he had not questioned the jurors himself and that the prosecutor had not used language precisely patterned after the holding in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968). Record 548, 552–553. But these expressions of regret are completely consistent with the trial judge's unambiguous conclusion that at least five potential jurors should have been but were not excluded for cause. Moreover, if the trial judge did not think he had

Mississippi Supreme Court agreed. 472 So. 2d 409, 421–422 (1985) (several potential jurors' "responses clearly indicated that they could properly be . . . dismissed both under *Witherspoon* and [under] *Adams*"); *id.*, at 422–423 (the trial judge erred "in refusing to dismiss other [potential] jurors for cause after they had unequivocally stated that they could not vote to impose the death penalty in any circumstance").

Despite the unequivocal responses of the potential jurors and the agreement of the state courts that they could have been excluded, the plurality—without even discussing the potential jurors' responses—claims to be unable to determine whether any of them was excludable for cause.[2] *Ante*, at 662. According to the plurality,

"despite their initial responses, the venire members might have clarified their positions upon further questioning and revealed that their concerns about the death penalty were weaker than they originally stated. . . . The inadequate questioning regarding the venire members' views in effect precludes an appellate court from determining whether the trial judge erred in refusing to remove them for cause." *Ante*, at 662–663 (footnote omitted).

In this brief passage, the plurality invents—but unfortunately does not justify—a new constitutional doctrine, not rooted in any constitutional provision and contradicted by our prior cases. The plurality suggests that potential jurors can-

erred, it is hard to imagine why he excluded Mrs. Bounds for cause after making what the Court believes was an "unambiguous finding" that he "was not authorized under the *Witherspoon-Witt* standard" to do so, *ante*, at 661, n. 10. See 472 So. 2d 409, 423 (1985) ("the trial court . . . recognized the error in its prior rulings and took affirmative action to correct that error").

[2] Although JUSTICE POWELL has joined the section of the Court's opinion containing this claim, he concludes that at least some of the potential jurors should have been excluded for cause. *Ante*, at 669. He thus necessarily rejects the plurality's reasoning in support of the contrary conclusion.

not properly be excluded for cause if "further questioning" *might* reveal that they did not really mean it when they said they would never vote to impose a death sentence. The Court has never before even hinted at such a requirement (perhaps because of the obvious difficulty of saying how much further questioning is necessary to satisfy it—a point on which the plurality understandably provides no guidance) and in fact has implicitly rejected it. That rejection is made clear by a comparison of the *voir dire* the Court found sufficient to justify an exclusion for cause in *Witt* with the *voir dire* of the potential jurors in this case. The entirety of the *voir dire* at issue in *Witt* was as follows:

> "[Prosecutor (P)]: Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?
>
> "[Prospective Juror (J)]: I am afraid personally but not—
>
> "[P]: Speak up, please.
>
> "[J]: I am afraid of being a little personal, but definitely not religious.
>
> "[P]: Now, would that interfere with you sitting as a juror in this case?
>
> "[J]: I am afraid it would.
>
> "[P]: You are afraid it would?
>
> "[J]: Yes, sir.
>
> "[P]: Would it interfere with judging the guilt or innocence of the Defendant in this case?
>
> "[J]: I think so.
>
> "[P]: You think it would.
>
> "[J]: I think it would." 469 U. S., at 415–416.

The *voir dire* of each of the five potential jurors at issue in this case was at least as extensive, and the responses of the potential jurors far more categorical. For example, the *voir dire* of Mrs. Coker went as follows:

"[P]: Mrs. Coker, do you have any conscientious scruples against Capital Punishment when imposed by the law?

"[Mrs. Coker]: I do not believe in it.

"[P]: You do not believe in Capital Punishment. Now, Mrs. Coker, do you tell me you don't believe in Capital Punishment in this type of case or in any type of case?

"[Mrs. Coker]: In any type of case.

"[P]: You mean to tell me that if the Court instructed you that this is a case, gave you the law and told you that this is a case whereby [sic] you could impose the Death Penalty, that you would not follow the law, if it meant imposing the Death Penalty?

"[Mrs. Coker]: [Inaudible.]

"[P]: Ma'am?

"[Mrs. Coker]: I would not.

"[P]: You would not do it?

"[Mrs. Coker]: I would not do it.

"[P]: You just don't believe in Capital Punishment.

"[Mrs. Coker]: That's right.

"[P]: And you would never vote for Capital Punishment, are you telling me, in any case or just this type case?

"[Mrs. Coker]: In any case. I would never vote for it in any case." Record 381–383.

The plurality makes no effort to reconcile its conclusion that the *voir dire* of the five potential jurors at issue in this case was inadequate to justify their exclusion for cause with our decision in *Witt*. I think it beyond doubt that the trial judge erroneously denied at least five of the State's motions to exclude potential jurors for cause.

The plurality also hints that these potential jurors may not have been properly excludable for cause because they were merely feigning objections to capital punishment in order to avoid jury service. *Ante*, at 652–653, 656, and n. 4. But the Constitution certainly permits the exclusion for cause of potential jurors who lie under oath about their views of capi-

tal punishment. Moreover, although there is no doubt that the trial judge and the prosecutor were concerned that some potential jurors were dissembling, Record 410, 445, 540, they agreed that only one or two had acted in this fashion, *id.*, at 540. Thus, even if those were not properly excludable for cause, three others were.

I also conclude that there is no federal constitutional obstacle to the trial judge's granting the State's request that it be given back a peremptory challenge for use to remove Mrs. Bounds.[3] (It is clear from the Mississippi Supreme Court's opinion that this would have been permissible under state law, see 472 So. 2d, at 423.) It is true that doing so would have produced a jury different from that which would have been impaneled had the trial judge denied the request and left his error uncorrected—and might have produced a jury different from that which would have been impaneled had the error not been made in the first place. But we have never suggested, and it simply could not be, that the Constitution prevents trial judges from correcting errors in jury selection that favor defendants if doing so might affect the composition of the jury. The Court implicitly concedes as much when it states that the trial judge in this case could have remedied his erroneous rulings in petitioner's favor by dismissing the *venire* and starting anew. *Ante*, at 663–664, n. 13. That would have replaced all 12 members of the jury rather than merely Mrs. Bounds. The less drastic means of remedying the error must be permissible.

We come, then, to the last difficulty—which is that the trial judge in fact did *not* restore to the State the erroneously

---

[3] Since the State's request was for a peremptory challenge *for use to exclude Mrs. Bounds,* see Record 546, it is certain that Mrs. Bounds would have been excluded in this fashion had the trial judge not excluded her for cause. This case is therefore quite different from those discussed by the Court, *ante*, at 664–665, in which the State argued that an improper exclusion for cause was rendered harmless by the fact that it had peremptory challenges remaining at the end of the *voir dire* which it *might have used* to exclude the potential juror.

denied peremptory challenge, but instead excluded Mrs. Bounds for cause. I assume for purposes of this opinion that she was not constitutionally excludable on those grounds. As the Court observes, we have said that "if a venireman is improperly excluded [for cause], any subsequently imposed death penalty cannot stand." *Davis* v. *Georgia*, 429 U. S. 122, 123 (1976) *(per curiam)*. We have not, however, extended this language so far as to vacate a sentence when it was *certain* that the jury that was impaneled was identical to the jury that would have been impaneled had the trial judge not erred. In fact, the Court itself indicates that such an extension would be misguided, stating that "the relevant inquiry is 'whether the composition of the *jury panel as a whole* could possibly have been affected by the trial court's error.'" *Ante*, at 665 (quoting *Moore* v. *Estelle*, 670 F. 2d 56, 58 (CA5) (specially concurring opinion), cert. denied, 458 U. S. 1111 (1982)).

The standard that the Court endorses requires that petitioner's sentence be upheld. As I have described, the trial judge could lawfully have granted the State's request that it be given a peremptory challenge for use to remove Mrs. Bounds. It is certain that the trial judge's decision to exclude Mrs. Bounds for cause rather than granting that request did not affect the composition of the jury in any way. In either event, Mrs. Bounds would have been excluded. The difference in the *form* of her exclusion—essentially the utterance of one set of words rather than another—could not possibly have affected the composition of the jury. There is thus no reason to vacate petitioner's sentence.[4]

---

[4] I agree with JUSTICE POWELL that it cannot be assumed "that the prosecutor would have excluded Mrs. Bounds 'but for'" the trial judge's erroneous failure to exclude a number of potential jurors for cause. *Ante*, at 669–670. See *supra*, at 677. But the identity of outcome that is relevant to this case is an identity between what occurred and what would have occurred *without the error that violated the defendant's constitutional rights*. Here, as JUSTICE POWELL concedes, *ante*, at 670–671, n. 2, that error was not the earlier failure to exclude other jurors for cause (which

Finally, I cannot omit commenting upon the plurality's *dictum* implying that it is unconstitutional for prosecutors to use peremptory challenges consistently to exclude potential jurors who express reservations about capital punishment. *Ante*, at 667–668. I disagree. Prosecutors can use peremptory challenges for many reasons, some of which might well be constitutionally insufficient to support a legislative exclusion. For example, I assume that a State could not legislate that those who are more sympathetic toward defendants than is the average person may not serve as jurors. But that surely does not mean that prosecutors violate the Constitution by using peremptory challenges to exclude such people. Since defendants presumably use their peremptory challenges in the opposite fashion, the State's action simply does not result in juries "deliberately tipped toward" conviction. The same reasoning applies to the exercise of peremptory challenges to remove potential jurors on the basis of the perceived likelihood that they would vote to impose a death sen-

---

aggrieved the State rather than the defendant), but rather the later decision to exclude Mrs. Bounds for cause instead of granting the State's request for restoration of a peremptory challenge. *That* decision, as I have explained, is certain to have had no effect on the composition of the jury.

JUSTICE POWELL does not dispute that the jury that sentenced petitioner was *identical* to the one that would have sentenced him had the trial judge granted the State's motion to exclude Mrs. Bounds by peremptory challenge. Nor does he dispute that the trial judge could, and indeed should, have granted that motion. Nevertheless, he believes that petitioner's sentence must be vacated because, had Mrs. Bounds not been excluded for cause, the trial judge might have refused to grant the State's motion, persisting in his mistaken failure to exclude earlier potential jurors. *Ibid.* But I cannot imagine why petitioner's sentence should be vacated merely because it is possible that the exclusion of Mrs. Bounds for cause deprived petitioner of the undeserved benefit of the trial judge's earlier errors. It seems to me that both in law and in logic the conclusion that petitioner's sentence should be sustained follows inevitably from the fact that petitioner was sentenced by a jury identical to the one that would have been impaneled had the trial judge, instead of excluding Mrs. Bounds for cause, taken a different, lawful course.

tence.    In this case, for example, it appears that the defendant used peremptory challenges to exclude at least two potential jurors whose remarks suggested that they were relatively likely to vote to impose a death sentence.    See Record 522 and 579 (Mr. Cavode), 573–577 and 579 (Mr. Hester).

For the foregoing reasons, I respectfully dissent.